UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KIMBERLY LAWRENCE, | Case No. 09-CV-2198 (PJS/JJK) |
| Plaintiff, | |
| v. | ORDER |
| CITY OF ST. PAUL, a municipal corporation in Minnesota; OFFICER LAURA BOLDUAN (individually and in her official capacity); SERGEANT SHEILA HOFF (individually and in her official capacity); OFFICER ROBERT JERUE (individually and in his official capacity); SERGEANT MATTHEW TOUPAL (individually and in his official capacity); DOES 1 THROUGH 5, inclusive (individually and in their official capacity); ST. PAUL CITY ATTORNEY'S OFFICE; and OFFICER WILLIAM WILLNER (individually), | |
| Defendants. | |

Jill M. Waite, ATTORNEY AT LAW, for plaintiff.[1]

Judith A. Hanson, ST. PAUL CITY ATTORNEY, for defendants City of St. Paul, Officer Laura Bolduan, Sergeant Sheila Hoff, Officer Robert Jerue, Sergeant Matthew Toupal, and St. Paul City Attorney's Office.

---

[1]Waite represented plaintiff in connection with these motions.  Waite failed to file briefs in opposition to defendants' motions to dismiss, and then she failed to appear at the hearing on those motions.  The Court later gave Waite permission to file briefs several months late, because, as the Court explained, "the Court is loath[] to visit the consequences of [Waite's] conduct on Lawrence, who was in no way responsible for her attorney's failures."  Docket No. 32.  After Waite filed the briefs, she was suspended from the practice of law by the Minnesota Supreme Court for, among other things, acting incompetently and without proper diligence in connection with other matters.  *See* Letter from Jill Waite to Clerk of Court (June 5, 2010) [Docket No. 42]. Lawrence now proceeds pro se.

Thomas S. McEachron, VOTEL ANDERSON & McEACHRON, for defendant Officer William Willner.

Plaintiff Kimberly Lawrence filed this action against multiple defendants — including her former boyfriend, William Willner, and several law-enforcement officers employed by the City of St. Paul — in connection with an incident that occurred during the early morning hours of August 24, 2003.  After leaving threatening messages on Willner's answering machine during the day, Lawrence showed up at his home shortly after midnight, uninvited and drunk, and confronted Willner and his new girlfriend, who were watching a movie in Willner's living room. A physical altercation ensued, and the police were called.  The police interviewed Willner, Lawrence, the new girlfriend, and others, and then submitted their reports to prosecutors. Lawrence was charged, and Willner was not.  Lawrence pleaded guilty to one of the charges, and the other charges were dropped.  Six years later — just a couple of days before the statute of limitations would have run on her claims — Lawrence filed this action, seeking damages against Willner and the other defendants for violating her constitutional rights.

This matter is before the Court on defendants' motions to dismiss or, in the alternative, for summary judgment.  For the reasons described below, the Court grants those motions as to all of Lawrence's claims save one.

## I.  BACKGROUND

In ruling on a Rule 12(b)(6) motion, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in Lawrence's favor.  *Aten v. Scottsdale Ins. Co.,* 511 F.3d 818, 820 (8th Cir. 2008).  And thus, although defendants strongly dispute many of

Lawrence's allegations, the Court must treat them as true.  The facts, as pleaded by Lawrence, are as follows:

Willner is a police officer employed by the City of Minneapolis.  Lawrence and Willner had a relationship that was intimate but not exclusive.  Compl. ¶ 13.  That relationship was also abusive.  Willner alternately professed his love for Lawrence and threatened to kill her, and at times Willner physically assaulted Lawrence.  Compl. ¶¶ 14, 18.  In July 2003, Willner began dating another woman, but Willner and Lawrence continued to see each other and have sex.  Compl. ¶¶ 15, 19.

On August 23, 2003, Willner and Lawrence agreed that Lawrence would meet Willner at his off-duty job, and then she would go to the Minnesota State Fair with her parents, perhaps accompanied by Willner.[2]  Compl. ¶ 20.  Lawrence was late, and Willner called Lawrence to inform her that he was going to the fair with someone else.  Compl.¶ 21.  Lawrence responded to this unwelcome news by leaving a series of angry voicemail messages for Willner.  In those messages, Lawrence informed Willner that she would tell others that he was a drunk; that she would publicly disclose his past threats against her; that she would have sex with his friends; that he was cruel; that she hated him; that she wished he would get shot, suffer, and die; and that she was going to change her phone number and forget that she had ever met him.  Compl. ¶ 21.  Lawrence proceeded to go to the fair with her parents and her seven-year-old son.  At the fair, she got drunk.  Compl. ¶ 22.

---

[2]The complaint states that the two made plans on August 23 to meet the *next* afternoon, but this appears to be a mistake.  The events giving rise to this action occurred in the early-morning hours of August 24, after the planned meeting was aborted.

Evidently Lawrence did not see Willner among the tens of thousands of people attending the fair, and this apparently caused her to suspect that he had lied when he told her that he would be attending the fair with someone else.  Compl. ¶ 23.  Sometime after midnight,[3] Lawrence drove to Willner's neighborhood to try to find out whether her suspicion was correct.  Compl. ¶ 23.  Lawrence parked about a block from Willner's house so that she could surprise him.  Compl. ¶ 24.  As she approached Willner's house, Lawrence saw an unfamiliar car in Willner's driveway, and she began to believe that Willner might have been telling her the truth about going to the fair with someone else.  Compl. ¶ 24.  In fact, the car belonged to Willner's new girlfriend, Michelle Kloncz, who was watching a movie with Willner in his house.

Lawrence rang Willner's doorbell.  Compl. ¶ 25.  According to Willner, when he opened the door, Lawrence forced herself into his home, charged at Willner and Kloncz, knocked over a table, and had to be physically restrained by Willner.  Compl. ¶ 61.  According to Lawrence, though — and, again, the Court must credit her version of the events — she never set foot in Willner's home.  Instead, when Willner opened the door, Lawrence asked him to come outside to talk, and it appeared to Lawrence that he was going to do so.  Compl. ¶ 25.  Lawrence then tried to peek around Willner to determine whether he was alone, but, as she did, Willner grabbed her shoulders, and she stumbled backward into some bushes.  Compl. ¶ 25.

Willner emerged from the house and grabbed Lawrence.  Compl. ¶ 26.  Lawrence struggled to get away, but Willner managed to tackle her on his driveway, where he pinned her

---

[3]The complaint states that the following events took place at 12:30 or 12:45 *p.m.*, but this appears to be a typographical error.  Compl. ¶ 23.

face-down.  Compl. ¶¶ 26-27.  Lawrence begged Willner to release her, but he told her he would

not release her until police arrived.  Compl. ¶ 28.

Willner's neighbor, Byron Phillips, heard a woman yelling for help.  Compl. ¶ 29.

Phillips could see Willner crouched on the driveway, but he could not see Lawrence initially

because his view was blocked by bushes.  Compl. ¶ 29.  Willner noticed Phillips and told him to

call the police.  Compl. ¶ 31.  Phillips, who by this time could see that Willner was restraining

Lawrence, noticed a small amount of blood on Lawrence's face and on the pavement.  Compl.

¶ 32.  Phillips returned to his house to call the police.  Compl. ¶ 33.

Lawrence caught sight of Lynn Mader, another of Willner's neighbors, as Mader (who

uses a wheelchair) wheeled herself from Phillips's house back to her own to use the bathroom.

Compl. ¶¶ 31, 33.  Lawrence mistakenly assumed that Mader was the woman who had been

inside Willner's house and yelled at her:  "I fucked Bill one week before he left for his vacation."

Compl. ¶ 33.  Lawrence went on to describe her sexual liaison with Willner, concluding, "I don't

know who you are, but I've been around for a long time."  Compl. ¶ 33.  Lawrence's behavior

enraged Willner, who slammed Lawrence's body and face into the pavement three or four times.

Compl. ¶ 34.  Lawrence sustained a head injury and lost "a lot" of blood.  Compl. ¶ 35.

Lawrence was having difficulty breathing, and she may have lost consciousness.  Compl. ¶ 35.

Phillips returned and reported to Willner that he had called the police.  Compl. ¶ 36.

Willner asked Phillips to stay there until the police arrived.  Compl. ¶ 36.  As the group waited

for the police, Mader emerged from her house and wheeled herself back to Phillips's.  Compl.

¶ 37.  Seeing Mader, Lawrence launched into another profane tirade about her recent sexual

liaisons with Willner.  Compl. ¶ 37.

As the police approached the house, Willner's neighbors flagged down the squad car. Compl. ¶ 39.  Before the squad car arrived, Willner got off of Lawrence and went into the house. Lawrence suggests that, at this point, Willner "planted" traces of her blood on his doorframe and couch, so as to create the false impression that she had entered his home.  Compl. ¶ 39.

One of the arriving officers — defendant Officer Robert Jerue — interviewed Willner and Kloncz inside Willner's house.  Compl. ¶ 43.  Lawrence's complaint is at times quite confusing, but she seems to suggest that, during these interviews, Officer Jerue learned that Willner was a Minneapolis police officer, and that Officer Jerue and Willner agreed that the police would conduct a sham investigation that would discredit Lawrence and protect Willner.  Compl. ¶¶ 43, 68-69; Lawrence Br. Opp. Willner Mot. Dismiss 14.

Meanwhile, another of the arriving officers — defendant Officer Laura Bolduan — approached Lawrence, who asked Officer Bolduan to take a photograph of the blood on the driveway.  Compl. ¶ 40.  Officer Bolduan did not do so, nor did she ask any other officers to do so.  Compl. ¶ 40.  Police found Lawrence's shoulder bag, which contained a cell phone and a camera.  Compl. ¶ 40.  Police searched the bag but refused to give it or any of its contents to Lawrence, effectively preventing Lawrence from taking photographs of the blood on the driveway or calling friends or family and asking them to take photographs for her.  Compl. ¶ 40. This, apparently, was part of the newly hatched conspiracy to cover up Willner's crime.

Lawrence was still bleeding profusely when police began questioning her.  Compl. ¶ 41. Lawrence initially lied to the police by telling them that her parents had dropped her off at Willner's home.  Later, though, she admitted that she had driven to Willner's home and parked her car some distance away.  Compl. ¶ 41.  Lawrence believes that police solicited this

information — that is, the information that she had been driving under the influence of alcohol — as a means of warning her that they could retaliate against her if she made trouble for Willner. Compl. ¶ 41.

According to the Original Offense/Incident Report ("incident report"), a responding medic concluded that the cut on Lawrence's head did not appear to have been caused by hitting her head on the pavement. Compl. ¶ 42. The incident report further indicated that police observed blood on the frame of Willner's door, in his entryway, and in his living room, and that there were drops of blood leading from the front door to the spot on the driveway where Willner had restrained Lawrence. Compl. ¶ 44. Police preserved no blood evidence and performed no blood-spatter analysis, though, and the incident report does not indicate that the police took any photographs of the blood. Compl. ¶ 44.

Lawrence was not formally arrested at Willner's house. Compl. ¶ 47. Instead, she was transported to Regions Hospital, apparently by ambulance. *See* Compl. ¶ 41. Lawrence claims that, at the hospital, police asked the medical staff to determine Lawrence's blood-alcohol level, which turned out to be 0.11. Compl. ¶ 49. Consistent with her theory that the police were not conducting a legitimate investigation but were instead acting to protect Willner, Lawrence alleges that the police sought to learn her blood-alcohol level merely to warn her again that they could retaliate if she made trouble for Willner. Compl. ¶ 49.

Lawrence allowed hospital staff to staple a one-inch laceration on her scalp. Compl. ¶ 52. She also had bruises on her hips and arms and scrapes on her shoulders, chin, back, and elbows, but she did not allow medical staff to irrigate those abrasions. Compl. ¶ 52. Lawrence was voluntarily discharged at about 3:00 a.m., and a friend drove her home. Compl. ¶ 52.

Before Lawrence left the hospital, police informed her that they had towed her car. Compl. ¶ 51.  The incident report reflects that the car was towed because Lawrence was a burglary suspect.  Compl. ¶ 48.  Lawrence, however, believes that the officers towed her car to give her yet another warning of their ability to retaliate against her if she pressed charges against Willner.  *Id.*

The incident report described the events at Willner's house as a "Burglary — Forced Entry, Night, Residence, Occupied."  Compl. ¶ 53.  No burglary charge was ever filed against Lawrence.  Compl. ¶ 53.  Lawrence alleges that police knew that no burglary had occurred, but used that charge on the paperwork to avoid classifying the matter as a domestic assault.  Compl. ¶ 53.  Defendant Sergeant Matthew Toupal later "approved" the incident report.  Compl. ¶ 55. This was apparently Sergeant Toupal's only involvement in Lawrence's case.

On August 25, 2003, less than forty-eight hours after the events at Willner's house, Lawrence obtained an ex parte order for protection ("OFP") from Hennepin County District Court Judge Daniel Mabley.  Compl. ¶ 58.

On August 27, 2003, defendant Sergeant Sheila Hoff reviewed the investigation against Lawrence.  Compl. ¶ 59.  She sent Officer Pamela Barrigan to speak to Lawrence, Compl. ¶ 59, while Sergeant Hoff herself interviewed Willner, Compl. ¶ 60.  Willner gave Sergeant Hoff a photograph of his couch — a photograph that purportedly showed Lawrence's blood on the couch — and Willner played for Sergeant Hoff several of the angry and threatening messages that Lawrence had left on his voicemail.  Compl. ¶ 61.  At about this point, the burglary investigation became a harassment investigation.  *Id.*

As noted, Lawrence contends that at all times — beginning shortly after their arrival at Willner's house — the police set out not to conduct a legitimate investigation, but to protect Willner (a fellow police officer) by discrediting Lawrence's accusation of domestic assault. As evidence of this sham investigation, Lawrence cites the following facts, among others:

- Police did not photograph or otherwise preserve evidence of the blood on Willner's driveway, and prevented Lawrence from photographing it herself. Compl. ¶¶ 40, 44.

- Police took at face value Willner's statements that Lawrence had entered his home, and they ignored evidence that would have undermined his account, such as inconsistencies in later statements made by Willner or a blood-spatter analysis that might have shown that the blood on the doorframe or in the house had been planted. Compl. ¶¶ 44, 45, 60.

- Police obtained Lawrence's blood-alcohol level at the hospital, but no blood-alcohol test appears to have been performed on Willner. Compl. ¶ 50.

- The incident report included a description of Willner's accusations against Lawrence, but not of Lawrence's accusations against Willner. Compl. ¶ 53.

- Although a later police report noted that Lawrence had obtained an OFP, the police apparently did not try to obtain a copy of that order or transcripts of the OFP proceedings. Compl. ¶ 59.

- There is no indication that Lawrence's domestic-violence accusation
  against Willner was ever investigated, much less prosecuted.

The Ramsey County Attorney's Office declined to file burglary charges against Lawrence. Compl. ¶ 63. The police department then "shopped the case" (to quote Lawrence) to the St. Paul City Attorney's Office, which brought charges of harassment and trespass against Lawrence without conducting its own investigation. Compl. ¶ 63; Ramsey County Criminal Compl., First Hanson Aff. at Ex. 4 [Docket No. 14-4]. The charges, which Lawrence does not describe in her complaint, were based in part on the August 23 voicemail messages and the August 24 incident at Willner's home, but also on a pattern of unwelcome phone calls and in-person visits made by Lawrence during the weeks leading up to the incident. *See* Ramsey County Criminal Complaint. In an inexcusable lack of candor, Lawrence did not disclose to the Court that she ultimately pleaded guilty to one of these criminal charges — a fact that is fatal to some of her claims, as explained below. *See* Full Transcript of Guilty Plea, Second Hanson Aff. at Ex. A [Docket No. 38].

On September 2, 2003, an evidentiary hearing regarding Lawrence's application for an OFP was conducted by Hennepin County District Court Judge Thor Anderson. Compl. ¶ 64. Willner's lawyer argued that Willner had acted in defense of himself and his property, and pointed out that if an OFP were entered, Willner would be barred by federal law from possessing a firearm — obviously a serious problem for a police officer. Compl. ¶ 64. Judge Anderson nevertheless entered an OFP against Willner. Compl. ¶ 65. In doing so, Judge Anderson criticized Willner's actions, which he concluded had caused Lawrence's injuries. Compl. ¶ 65.

Lawrence now brings claims under 42 U.S.C. § 1983 alleging that Willner acted under color of state law and used excessive force in restraining her, and that Officers Bolduan and Jerue, Sergeants Toupal and Hoff, the St. Paul City Attorney's Office, and the City of St. Paul (collectively "St. Paul defendants"), acting individually or in conspiracy with Willner, violated a host of Lawrence's constitutional rights.  Lawrence also brings a state-law malicious-prosecution claim against all defendants.

## II.  ANALYSIS

### A.  Standard of Review

As noted, in reviewing a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.,* 511 F.3d 818, 820 (8th Cir. 2008).  Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007).  In assessing the plausibility of a claim, the Court need not accept as true any allegation that is "conclusory."  *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950-51 (2009) (holding that "conclusory" allegations "are not entitled to the assumption of truth").

A Rule 12(b)(6) motion must be treated as a motion for summary judgment if "matters outside the pleadings are presented to and not excluded by the court . . . ." Fed. R. Civ. P. 12(d). But the Court may consider materials that are part of the public record without transforming the motion into one for summary judgment.  *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999); *see also* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2010) (court may consider "items subject to judicial notice, matters of

public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned"). The St. Paul defendants have submitted copies of the criminal complaint filed against Lawrence, the state-court judge's finding of probable cause to believe that Lawrence had committed a crime, a full transcript of the hearing at which Lawrence pleaded guilty, and the judgment and register of actions in Lawrence's criminal case. First Hanson Aff. at Exs. 4-6; Second Hanson Aff. at Ex. A. Lawrence does not dispute the authenticity of these documents. The Court will consider these matters of public record in deciding defendants' motions to dismiss, and will not convert those motions into motions for summary judgment.

## B. § 1983 Claims

Lawrence brings § 1983 claims against all defendants for excessive force, deprivations of substantive and procedural due process, equal-protection violations, Fourth Amendment violations, and First Amendment retaliation, and Lawrence brings a *Monell* claim against the City of St. Paul. The Court will address Lawrence's § 1983 claims as they relate to the St. Paul defendants, and then address those claims as they relate to Willner. Before doing so, however, the Court first considers whether it has subject-matter jurisdiction over Lawrence's claims.

### 1. Jurisdiction

The St. Paul defendants argue that this Court lacks subject-matter jurisdiction over Lawrence's claims under the *Rooker-Feldman* doctrine. *See Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). The Court disagrees.

-12-

Under the *Rooker-Feldman* doctrine, a federal district court lacks subject-matter jurisdiction over a lawsuit brought by plaintiffs who "ha[ve] litigated and lost in state court" and who "essentially invite[] federal courts of first instance to review and reverse unfavorable state-court judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 283 (2005); *see also Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85-92 (2nd Cir. 2005) (discussing *Rooker-Feldman* doctrine after *Exxon Mobil*). Lawrence extends no such invitation in this case. Lawrence is not asking this Court to reverse or otherwise set aside her state-court conviction — that is, Lawrence "plainly has not repaired to federal court to undo the [Minnesota] judgment [against her]." *Exxon Mobil Corp.*, 544 U.S. at 293. The Court therefore is not deprived of subject-matter jurisdiction by the *Rooker-Feldman* doctrine.

Some of Lawrence's claims for damages — particularly her due-process and equal-protection claims — may seem, at least in part, to challenge the constitutionality of her state-court conviction. And, under *Heck v. Humphrey*, a § 1983 plaintiff cannot bring an action for damages based on an allegedly unconstitutional conviction unless the conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. 477, 486-87 (1994).

If *Heck v. Humphrey* restricted the subject-matter jurisdiction of federal courts — as does the *Rooker-Feldman* doctrine — this Court would have to decide to what extent, if any, Lawrence's claims are barred under *Heck v. Humphrey* before addressing the merits of those claims. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-101 (1998). But *Heck v. Humphrey* is not jurisdictional, *see Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir. 1999) ("the

*Heck* defense is not jurisdictional"), and thus the Court may address the merits of Lawrence's claims without first deciding to what extent those claims are barred by *Heck v. Humphrey*.  The Court will proceed in that manner.

### 2.  § 1983 Claims Against St. Paul Defendants

The St. Paul defendants argue that qualified immunity protects them from liability on all of Lawrence's § 1983 claims.  The Supreme Court established a two-part inquiry for qualified immunity in *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under *Saucier*, the Court first determines whether a constitutional violation occurred.  If no constitutional violation occurred, plaintiff's § 1983 claim obviously fails, and the Court need not reach the question of qualified immunity.  If a constitutional violation occurred, the Court then determines whether the constitutional right was clearly established at the time of the alleged violation so that a reasonable officer would have understood that his or her conduct violated the right.

Under *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009), the Court need not strictly follow *Saucier*'s two-step protocol.  Instead, the Court can find that an officer is entitled to qualified immunity because the officer's conduct did not violate a clearly established constitutional right, without reaching the question of whether the officer's conduct violated a constitutional right at all.

### a.  Excessive Force

Although her complaint states that all of her § 1983 claims are brought "against all defendants," Compl. Count I, Lawrence clarifies in her brief that she is not alleging excessive force by any of the St. Paul defendants.  Lawrence Br. Opp. St. Paul Mot. Dismiss 13.  No facts

alleged in Lawrence's complaint would support such a claim, and the Court therefore must dismiss the excessive-force claim against the St. Paul defendants.

### b. Substantive Due Process

Lawrence alleges two types of substantive-due-process violations by the St. Paul defendants. First, Lawrence alleges that the St. Paul defendants deprived her of substantive due process by dishonestly investigating Willner's spurious charges against her. Second, Lawrence alleges that the St. Paul defendants deprived her of substantive due process by failing to investigate her legitimate charges against Willner.

"[T]he theory of substantive due process is properly reserved for truly egregious and extraordinary cases." *Myers v. Scott Cnty.*, 868 F.2d 1017, 1018 (8th Cir. 1989). To recover for a deprivation of substantive due process, a "plaintiff 'must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Slusarchuk v. Hoff*, 346 F.3d 1178, 1181-82 (8th Cir. 2003) (emphasis in original) (quoting *Moran v. Clarke*, 296 F.3d 638, 651 (8th Cir. 2002) (en banc)).

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The Supreme Court has previously recognized that substantive-due-process protections extend to the rights to marry, to have children, to educate and raise one's children, to privacy within intimate relationships, to use contraception, to abortion, and perhaps to refuse unwanted medical

treatment.  *Moran*, 296 F.3d at 644 n.5 (collecting cases).  "'Substantive due process' analysis must begin with a careful description of the asserted right," and courts must exercise restraint in expanding the scope of such rights.  *Reno v. Flores*, 507 U.S. 292, 302 (1993); *see also Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (substantive-due-process analysis must begin with an examination of the interest allegedly violated).  The Court concludes that, even accepting Lawrence's factual allegations as true, she has not been deprived of substantive due process.

i.  Dishonest Investigation of Willner's Allegations Against Lawrence

Lawrence contends that the police defendants conducted a sham investigation of Lawrence in which Willner's account of the events was deliberately and falsely bolstered in an attempt to trump up charges against Lawrence.  Needless to say, Lawrence's allegations, if true, would be profoundly troubling.  But under the specific circumstances of this case, Lawrence has not been deprived of substantive due process.

The Eighth Circuit has recognized that, in at least some circumstances, an intentionally or recklessly inadequate investigation can violate an accused's liberty interest in "obtaining fair criminal proceedings *before being denied one's liberty in the most traditional sense*."  *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 n.8 (2001) (emphasis added) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).  In all of the cases in which the Eighth Circuit has suggested that an unfair investigation may have deprived the accused of substantive due process, the investigation caused a *separate* deprivation of life, liberty, or property.  Lawrence has not pointed to, and the Court has not found, any Eighth Circuit case in which an unfair investigation — in and of itself — was held to have deprived the accused of substantive due process.  *See, e.g., Wilson*, 260 F.3d 946

(reckless investigation resulted in trial, conviction, and nine years' imprisonment of § 1983 plaintiff for murder he did not commit before § 1983 plaintiff was pardoned); *Moran*, 296 F.3d 638 (intentionally inadequate investigation led to § 1983 plaintiff's investigation, prosecution, stigmatization, and unpaid suspension and demotion from his job as a police officer; furthermore, inadequate investigation may have been undertaken based on the § 1983 plaintiff's race); *see also Kuehl v. Burtis*, 173 F.3d 646 (8th Cir. 1999) (officer's inadequate investigation prior to arresting, jailing for two to three hours, and prosecuting assault victim whom officer erroneously believed to be assault perpetrator constituted a Fourth Amendment violation).

Lawrence contends that the incident report and the supplemental report contain unspecified false information, and that the inclusion of this false information in the police reports violated her right to substantive due process. The Court initially notes that Lawrence seems to concede that most of the information in the police reports was *true*. She admits that, after she left a series of threatening and abusive voicemail messages for Willner, she showed up at Willner's house, drunk and uninvited, and that Willner, unhappy at her presence, restrained her and asked a neighbor to call the police. In fact, it is not entirely clear what aspects of the police reports Lawrence contends are false. As best as the Court can tell, the only aspects of the reports that Lawrence seems to claim are untrue (as opposed to merely indicative of an inadequate investigation) are the reports' description of Willner as the victim and Lawrence as the perpetrator, their characterization of the incident as a burglary rather than as a trespass, and perhaps their statements about the conclusions drawn by the officers about the blood (i.e., that the blood drops led from the door to the driveway rather than from the driveway to the door).

In any event, even if the police defendants knowingly inserted false information in their reports, Lawrence was not deprived of a constitutionally protected interest *because* of that false information, and thus she was not deprived of substantive due process. *See Shock v. Tester*, 405 F.2d 852, 855 (8th Cir. 1969); *see also Landrigan v. City of Warwick,* 628 F.2d 736, 744-45 (1st Cir. 1980) ("[T]he mere filing of the false police reports, by themselves and without more, [does] not create a right of action in damages under 42 U.S.C. § 1983." (footnote omitted)). As the First Circuit explained, "The focus . . . ordinarily should be on the consequences, if any, not on the mere existence of the report," because a false report, standing alone, does not deprive a person of substantive due process. *Landrigan*, 628 F.2d at 744-45.

Lawrence has not alleged that, as a *consequence* of the allegedly false reports, she was deprived of a constitutionally protected interest. Lawrence was not arrested or detained because of a false report. Lawrence was not prevented from obtaining an OFP against Willner. And Lawrence was not deprived of her right to file a lawsuit against Willner to seek compensation for her injuries.

Of course, Lawrence was later charged with three counts of gross-misdemeanor harassment and one count of misdemeanor trespass. But those charges were not the result of any false information in the police reports regarding the August 24 incident. Instead, those charges arose out of *weeks* of unwanted visits and phone calls by Lawrence, including, but not limited to, the unwanted phone calls on August 23 and the unwanted visit on August 24. Lawrence admits to this pattern of harassing conduct — and, indeed, she pleaded guilty to one of the criminal charges. In short, even if the police defendants intentionally inserted false information in their

reports about the August 24 incident, that false information did not cause Lawrence to lose her life, liberty, or property, and thus Lawrence was not deprived of substantive due process.

Even if the Court is incorrect — that is, even if the unfair or dishonest investigation, in and of itself, deprived Lawrence of substantive due process — the St. Paul defendants are entitled to qualified immunity. Qualified immunity protects government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *see also Pearson v. Callahan,* 129 S.Ct. at 815 (quoting *Harlow*). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). In light of the foregoing, the Court finds that it was not clearly established — and, indeed, that it is *still* not clearly established — that an unfair or dishonest investigation that does not result in a deprivation of life, liberty, or property violates the Constitution.

ii. Inadequate Investigation of Lawrence's Allegations Against Willner

Lawrence contends that her right to substantive due process was also violated when the St. Paul defendants did not adequately investigate her allegations that Willner had assaulted and falsely arrested her. The Constitution creates no right to *any* investigation of a reported crime, much less an adequate investigation, and thus Lawrence's claim must be dismissed. *Vinyard v. Wilson*, 311 F.3d 1340, 1356 (11th Cir. 2002); *cf. DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 (state's failure to protect individual against private violence is not a due-process violation). Even if the Court is incorrect, the right to an adequate investigation of a

reported crime is certainly not clearly established, and thus the St. Paul defendants are entitled to qualified immunity.

### iii.  § 1983 Malicious Prosecution

Lawrence suggests in her briefing that if her substantive-due-process claims are dismissed, then the Court should allow her to proceed on "a § 1983-type malicious prosecution claim (where the underlying federal constitutional right is substantive due process)."  Lawrence Br. Opp. St. Paul Mot. Dismiss 19.  But that possibility seems to be foreclosed by *Albright v. Oliver*, 510 U.S. 266 (1994), in which no fewer than seven Justices agreed (albeit on different grounds) that a prosecution without probable cause does not give rise to a substantive-due-process claim.  *Id*. at 271 (plurality opinion); *id.* at 281 (Kennedy, J., concurring); *id*. at 287 (Souter, J., concurring).

Even if such a claim were theoretically possible, Lawrence's particular wrongful-prosecution claim would have to be dismissed — most importantly, because the prosecution of Lawrence was not wrongful.  After all, Lawrence was *convicted* after pleading guilty to one count of harassment in exchange for dismissal of the other charges.  *See Bontkowski v. United States*, 28 F.3d 36, 37 (7th Cir. 1994) (prosecution ending in guilty plea is not indicative of plaintiff's innocence and thus cannot give rise to a malicious-prosecution claim).  Moreover, even if the prosecution of Lawrence had not resulted in a conviction, Lawrence could not recover for malicious prosecution under § 1983 (as opposed to under state tort law) unless she could show that the St. Paul defendants, in investigating and prosecuting her, "also infringe[d] some provision of the Constitution or federal law."  *Gunderson v. Schlueter*, 904 F.2d 407, 409 (8th Cir. 1990).  "A state law cause of action for malicious prosecution is not interchangeable with a

federal action, for underlying any § 1983 claim is a constitutional violation.  A plaintiff bringing

a federal malicious prosecution claim must first clear the preliminary hurdle of stating a

cognizable constitutional violation before his § 1983 action can go forward."  *Washington v.*

*Summerville*, 127 F.3d 552, 559 (7th Cir. 1997).  As the Court discussed above, and will further

discuss below, Lawrence cannot establish that the investigation or prosecution violated her rights

under federal law.

For these reasons, Lawrence's claim against the St. Paul defendants for depriving her of

substantive due process must be dismissed.

### c.  *Procedural Due Process*

Lawrence argues that the St. Paul defendants deprived her of procedural due process

when police conducted a biased investigation of Willner's accusations against her and when the

City Attorney's Office filed charges without first conducting its own independent investigation of

those accusations.[4]  Lawrence's claim is meritless.  "By pleading guilty, [Lawrence] elected to

---

[4]At various times, Lawrence makes both substantive- and procedural-due-process claims
based on the investigation of the August 24 incident.  Her briefing does not always distinguish
between the two types of claims, but her complaint does.  Lawrence alleges a *substantive*-due-
process violation based on both the sham investigation of Willner's allegations against her *and*
the inadequate investigation of her allegations against Willner.  Compl. ¶ 69(b).  Lawrence
alleges a separate "due process" violation (by which the Court understands her to make a
*procedural*-due-process claim) based on the failure of the police department and the City
Attorney's Office to fairly and adequately investigate Willner's allegations against her before
charging her with crimes.  Compl. ¶ 69(c).  Thus, the Court does not understand Lawrence to be
alleging that she was deprived of *procedural* due process when the St. Paul defendants failed to
adequately investigate her allegations against Willner.

The Court notes that any such claim would fail.  As discussed above, the Court is
unaware of any judicial decision finding that someone who reports a crime is deprived of a
constitutionally protected interest in life, liberty, or property when that report is not adequately
investigated.  Because Lawrence was not deprived of an interest protected by the Fourteenth

(continued...)

[forgo] the post-deprivation process best suited to determining whether [the investigation and prosecution] in fact violated [her] due process rights — the criminal trial.  Any procedural due process claims are therefore barred."  *Vennes v. An Unknown Number of Unidentified Agents of the United States*, 26 F.3d 1448, 1452 (8th Cir. 1994).

### d.  Equal Protection

Lawrence next alleges that when the St. Paul defendants conducted a sham investigation of Willner's accusations against her and failed to adequately investigate her accusations against Willner, Lawrence was deprived of her right to equal protection.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Lawrence alleges that she, a woman, was treated less favorably than Willner, a man, but the two were plainly not similarly situated.  Willner was sitting quietly in his own home when Lawrence suddenly showed up at his door — drunk, uninvited, unexpected, and unwelcome — in the early morning hours of August 24, after Lawrence had left numerous threatening and abusive voicemail messages for Willner on August 23, and after Lawrence had left her car a block away in order to ambush Willner.  During the ensuing physical altercation, Willner asked bystanders to call the police, while Lawrence abused an innocent bystander with an obscene tirade.  After police arrived, Lawrence lied to them, and then admitted her lie.  The St. Paul defendants had ample reason to treat Willner differently than Lawrence.

---

[4](...continued)
Amendment, she obviously was not deprived of such an interest without due process.

Without any real basis for alleging that Lawrence was treated unfairly because she was a woman (or because she was a member of another suspect or semi-suspect class), Lawrence bases her equal-protection claim primarily on a class-of-one-theory. But in *Engquist v. Oregon Department of Agriculture*, the Supreme Court reasoned that a class-of-one theory is a "poor fit" in a context that involves discretionary decisionmaking. 128 S. Ct. 2146, 2155 (2008). Indeed, in illustrating the point, the Supreme Court used the example of a police officer deciding to ticket a driver for speeding. *Id.* at 2154 ("[A]llowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized."). The Eighth Circuit has interpreted *Engquist* to bar class-of-one equal-protection claims challenging investigative decisions because "[a] police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion." *Flowers v. City of Minneapolis*, 558 F.3d 794, 799 (8th Cir. 2009). Lawrence's class-of-one equal-protection claim against the St. Paul defendants therefore fails.[5]

---

[5]Even if Lawrence could theoretically proceed on a class-of-one claim, she has not made the requisite showing. A class-of-one plaintiff must show that she "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). As the Court has explained, Lawrence and Willner were not similarly situated, and there was good reason to treat them differently.

*e. Fourth Amendment*

Lawrence claims that, once at the hospital, she "was detained for a sufficient amount of time so that legally, the detention constituted an arrest" in violation of the Fourth Amendment. Compl. ¶ 47.[6]  The St. Paul defendants dispute that Lawrence was arrested.

To establish a Fourth Amendment violation, Lawrence must show that she was seized, and that the seizure was unreasonable.  *Katz v. United States*, 389 U.S. 347 (1967).  Lawrence was seized for purposes of the Fourth Amendment only if a reasonable person in her circumstances would have concluded that she was not free to leave.  *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also United States v. Griffith*, 533 F.3d 979, 983 (8th Cir. 2008) (quoting *Mendenhall*).  Without some showing that Lawrence was not free to leave, "otherwise inoffensive contact between a member of the public and the police" is, as a matter of law, not a seizure.  *United States v. Barry*, 394 F.3d 1070, 1075 (8th Cir. 2005) (internal quotation omitted).

Lawrence was apparently transported to the hospital in an ambulance to be treated, not in a squad car to be investigated.  Compl. ¶ 41.  Lawrence nevertheless alleges that when police

---

[6]Lawrence purports to bring a § 1983 claim for violation of her rights "under the Fourth Amendments to the federal and Minnesota state constitutions."  Compl. ¶ 69(c)(1).  The Court notes that there is no Fourth Amendment to the Minnesota Constitution and construes this claim as arising under the Fourth Amendment to the United States Constitution and under Article I, Section 10 of the Minnesota Constitution.  The rights provided by these two provisions are co-extensive insofar as is relevant here.  *See State v. Carter*, 596 N.W.2d 654, 657 (Minn. 1999).  But the Minnesota Supreme Court has not recognized a private right of action for violations of the state constitution.  *Mlnarik v. City of Minnetrista*, No. A09-910, 2010 WL 346402, at *1 (Minn. Ct. App. Feb. 2, 2010).  The Court therefore must dismiss Lawrence's claim under the Minnesota Constitution.

officers met her at the hospital, they directed hospital staff to check Lawrence's blood-alcohol level, and they informed her that they had towed her car.  Compl. ¶¶ 49, 51.  Lawrence also alleges that Officers Bolduan and Jerue "talked to" her at the hospital.  But none of the facts alleged by Lawrence suggests that she was arrested, detained, or restrained; that she was told that she could not leave or that the hospital staff was told not to allow her to leave; that she objected to the presence of the police officers; or that she felt compelled to speak to the police officers.  Compl. ¶ 54.  From start to finish, Lawrence was at the hospital for no longer than two hours.  Her wounds were treated, and then she walked out the door with a friend.  *See* Compl. ¶¶ 23, 52.

The only fact that Lawrence points to that might conceivably amount to a seizure is the blood-alcohol test that she says was administered at the officers' direction.  But there is no allegation in Lawrence's complaint that she believed that she was obligated to submit to the test, and the complaint does not allege facts that would make such a belief reasonable.  To the contrary, Lawrence made several decisions about her care — accepting some of the treatment offered by medical staff, but refusing other treatment that was offered.  Compl. ¶ 52.  Based on the facts alleged in Lawrence's complaint, a reasonable person would have felt free to refuse a blood-alcohol test, and thus there was no seizure.  *See United States v. McKines*, 933 F.2d 1412, 1419 (8th Cir. 1991) ("We must inquire, then, whether all the circumstances involved in the officers' questioning . . . were so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave.").  Without a seizure, there can be no violation of the Fourth Amendment.  *Cf. United States v. Miller*, 974 F.2d 953, 956 (8th Cir. 1992) (arrest is necessarily a seizure).

*f.  First Amendment Retaliation*

Lawrence alleges that the St. Paul defendants violated her rights under the First

Amendment when they towed her car, directed hospital personnel to determine her blood-alcohol

level, and pursued criminal charges against her for retaliatory purposes — either to punish her

for accusing Willner of assault in the first place or to discourage her from pursuing her

accusation further.

Insofar as Lawrence's claim is based on allegedly retaliatory prosecution, that claim fails.

The Supreme Court has held that a plaintiff asserting a § 1983 claim for retaliatory prosecution

must show a lack of probable cause for the underlying charge.  *Hartman v. Moore*, 547 U.S. 250,

265-66 (2006).  The St. Paul defendants plainly had probable cause for prosecuting Lawrence for

harassment and trespass.  After all, she pleaded guilty to one of the charges, and the others were

dropped as part of a plea agreement (and not because of any finding of innocence).  Moreover,

the trial court made a finding of probable cause in Lawrence's state-court prosecution — a

finding that is fully supported by the facts alleged in Lawrence's complaint.  By Lawrence's own

admission, she made a series of abusive and threatening phone calls and unwelcome visits to

Willner over a period of several weeks.

With respect to the other grounds for her retaliation claim, however, Lawrence fares

better.  To succeed on her First Amendment retaliation claim, Lawrence "must plausibly plead

that [she] engaged in protected activity and that defendants, to retaliate for the protected activity,

took adverse action against [her] that would chill a person of ordinary firmness from engaging in

that activity."  *Zutz v. Nelson*, 601 F.3d 842, 848-49 (8th Cir. 2010) (internal quotations omitted).

Thus, Lawrence must prove that (1) she engaged in protected activity; (2) a defendant took

adverse action against her; (3) the adverse action taken against her would chill a person of ordinary firmness from engaging in protected activity; and (4) the adverse action was taken against her *because* she had engaged in protected activity.

As to the first element, there is no doubt that Lawrence complained to Officers Bolduan and Jerue about being assaulted by Willner.  When a victim of a crime reports that crime to a police officer, she is exercising her First Amendment right to petition the government for the redress of grievances.  *Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty.*, 482 F.3d 1232, 1243 (10th Cir. 2007).

As to the second element, Lawrence pleaded that the St. Paul defendants towed her car and ordered her blood to be tested.  Both are adverse actions.

As to the third element, a jury could find that the towing of Lawrence's car and the testing of her blood were sufficiently serious to deter a reasonable person from engaging in protected activity.  The chilling effect of an adverse action must be determined on an objective basis. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003).  "The question is not whether the plaintiff herself was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done."  *Id*.  It is therefore not dispositive that Lawrence herself was not deterred from seeking an order for protection against Willner.  Where "the punitive machinery of government" is employed — even in a minor way — in retaliation for protected First Amendment activity, the question of an adverse act's chilling effect is best left to a jury.  *Id*. (issue of whether four parking tickets totaling $35 in fines amounted to adverse action sufficient to chill a person of ordinary firmness was a jury question).

Finally, as to the fourth element:  The St. Paul defendants argue that Lawrence's claim fails because there is no causal connection between Lawrence's protected activity and the allegedly retaliatory behavior (the towing of her car and the testing of her blood).  *See Nelson v. Shuffman*, 603 F.3d 439, 450 (8th Cir. 2010).  But unless the issue of causation is "so free from doubt as to justify taking it from the jury," the issue should be tried.  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004) (internal quotation omitted).  Although the question is close, the Court holds that Lawrence has pleaded sufficient facts to enable a jury to find that Officers Bolduan and Jerue had her car towed and her blood tested in order to retaliate against her for accusing Willner of assault — or at least to deter her from continuing to press that accusation.

It is possible (perhaps even likely) that Officers Bolduan and Jerue had a legitimate reason for ordering that Lawrence's car be towed and her blood be tested, but that reason is not apparent on the face of Lawrence's complaint.[7]  To the contrary, Lawrence's complaint reveals no reason whatsoever to suspect her of burglary, yet, according to Lawrence's complaint, the only reason given by the police for towing her car was that she was a burglary suspect.  Compl. ¶ 48.  Likewise, Lawrence's complaint reveals little reason why police would order a hospital to conduct a blood-alcohol test on someone suspected of  burglary — or, for that matter, of harassment or trespass.  Finally, according to the complaint, Judge Anderson (who entered an

---

[7]The St. Paul defendants submitted an affidavit of Sergeant Toupal, who avers that "it is consistent with police policy to tow vehicles where there is an active investigation."  Toupal Aff. ¶ 3 [Docket No. 13].  This does not help the Court make any conclusions as to causation. Towing Lawrence's car would have been "consistent with" a police policy that was silent as to when a suspect's car should be towed or that explicitly allowed for ad hoc determinations by officers as to whether to tow a given vehicle.  Sergeant Toupal's affidavit does not address the question of why the officers decided to tow Lawrence's car in this particular instance and whether her First Amendment activity played a part in their decision.

OFP against Willner) was highly critical of Willner's behavior, and yet the St. Paul defendants seem barely to have acknowledged, much less to have investigated, Lawrence's assault allegations.  Compl. ¶ 65.

It may be that Lawrence will not be able to prove that the allegedly retaliatory police actions were caused by Lawrence's accusation that Willner assaulted her.  It may even be that the St. Paul defendants will win summary judgment on this issue after discovery is taken and the record fleshed out.  But this matter is before the Court on a motion to dismiss.  Taking the facts pleaded in Lawrence's complaint as true, the Court finds that a jury could conclude that Officers Bolduan and Jerue retaliated against Lawrence for accusing Willner of assault when they ordered her car to be towed and her blood to be tested.

Having established that Lawrence has pleaded a constitutional violation, the Court must next determine whether Lawrence's constitutional right was clearly established such that a reasonable officer would have understood that his or her conduct violated that right.  *Saucier*, 533 U.S. at 201.  Although the Eighth Circuit has not squarely addressed the First Amendment implications of reporting a crime to law enforcement, that does not mean that the right of citizens to report crimes is not clearly established.  "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer,* 536 U.S. 730, 741 (2002).  To defeat a qualified-immunity defense, the officials need only have "fair warning that their alleged conduct was unconstitutional."  *Brown v. Fortner,* 518 F.3d 552, 561 (8th Cir. 2008).

The First Amendment specifically protects an individual's right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  A victim's complaint that she

has been assaulted plainly constitutes a grievance, and asking police to investigate or otherwise take action against the alleged perpetrator of the assault is plainly a form of petitioning the government for a redress of that grievance.  Lawrence's complaint to Officers Bolduan and Jerue about Willner's conduct therefore falls squarely within the ambit of the First Amendment.  And a citizen's right to engage in First Amendment activity "without facing retaliation from government officials is clearly established."  *Kilpatrick v. King*, 499 F.3d 759, 767 (8th Cir. 2007).  In short, reasonable officers in the positions of Officers Bolduan and Jerue could not have believed that it was constitutional to abuse their authority as police officers in order to retaliate against a citizen for accusing a fellow police officer of a crime.  Officers Bolduan and Jerue are therefore not entitled to qualified immunity on Lawrence's First Amendment claim.[8]

That claim, however, may not be maintained against any St. Paul defendant other than Officers Bolduan and Jerue.  Lawrence has pleaded no facts suggesting that Sergeants Hoff or Toupal or anyone working in the City Attorney's Office had anything to do with the towing of Lawrence's car or the testing of her blood.  A person may be liable under § 1983 only for those constitutional deprivations that he or she "causes."  Because no St. Paul defendant apart from Officers Bolduan and Jerue is alleged to have caused the allegedly retaliatory acts, Lawrence's retaliation claim against the other St. Paul defendants must be dismissed.

---

[8]Lawrence's First Amendment claim is also not barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), as it does not call into question the validity of her state-court conviction.

g.  Monell *Liability*

Under *Monell v. Department of Social Services*, a government entity may be held liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."  436 U.S. 658, 694 (1978).  As the Court has discussed, all of Lawrence's claims against all of the St. Paul defendants — with the sole exception of her First Amendment retaliation claim against Officers Bolduan and Jerue — must be dismissed.  The City therefore cannot be held liable under *Monell* except to the extent that Officers Bolduan or Jerue were acting pursuant to a municipal policy or custom in retaliating against Lawrence.

Lawrence alleges *Monell* liability against the City of St. Paul based on its failure to implement policies "to flag cases in which a police officer is alleged to be the perpetrator of one or more crimes, but alleges that he is actually the victim of one or more crimes" or to "[e]nsure that the police and prosecutorial investigations are handled in a neutral manner."  Compl. ¶ 69(e).  To be clear, Lawrence does not allege that St. Paul had implemented a policy that *directed* officers to commit unconstitutional acts, but rather that St. Paul had not implemented a policy that would have *prevented* the complained-of constitutional violations.  *Id.*

To maintain a claim that "a municipality should have done more to prevent constitutional violations by its employees, a plaintiff must establish the existence of a 'policy' by demonstrating that the inadequacies were a product of deliberate or conscious choice by policymakers."  *Szabla v. City of Brooklyn Park*, 486 F.3d 385, 390 (8th Cir. 2007).  The city policy or custom must be the "moving force" behind the constitutional violation.  *Monell*, 436 U.S. at 694.

Lawrence has pleaded no facts giving rise to an inference that the problems she complains of are widespread or persistent, or that the City has a history of retaliating against individuals who accuse police officers of committing crimes.  Nothing in Lawrence's complaint suggests that the allegedly retaliatory conduct in this case was anything more than a one-time occurrence.  An "isolated incident" cannot support a claim that the City was deliberately indifferent to retaliatory actions by its police force.  *Szabla*, 486 F.3d at 393.  Lawrence therefore has failed to state a claim for *Monell* liability.

### 3.  § 1983 Claims Against Willner

The Court now turns to the § 1983 claims against Willner.

#### a.  Excessive Force[9]

Willner did not violate Lawrence's constitutional rights during the early morning hours of August 24 — and thus is not liable under § 1983 — unless he acted under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988) (emphasis added).  Because Lawrence has pleaded no facts plausibly indicating that Willner was acting under color of state law during the August 24 altercation, Willner cannot be held liable under § 1983.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." (emphasis and internal citations omitted)).

Willner is a police officer employed by the City of Minneapolis, but that obviously does not mean that everything he does is done under color of state law.  Police officers, like everyone

---

[9]Lawrence's excessive-force claim against Willner takes the form of a substantive-due-process claim as well as a Fourth Amendment claim.  The distinction is of no consequence, because to prevail on either theory Lawrence would have to prove that Willner was acting under color of state law.

else, have personal lives, and what they do in their personal lives is not done under color of state law. "It is clear that under 'color' of law means under 'pretense' of law. Thus acts of officers in the ambit of their personal pursuits are plainly excluded." *Screws v. United States,* 325 U.S. 91, 111 (1945) (plurality opinion); *see also Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997) (quoting *Screws*).

"[T]o find whether an official acts under color of law, we look to see whether a sufficient nexus exists between the official's public position and the official's harmful conduct." *Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009). To determine whether such a nexus exists — that is, to determine whether a defendant acted as a private individual or as a public official — a court must undertake a fact-intensive inquiry in which it considers at least the following: (1) whether the officer was on duty; (2) whether the officer wore a uniform or bore other indicia of state authority such as a badge or gun; (3) whether the officer had access to the victim because of his position as a public official; (4) whether the officer's motivation in acting was personal or official; and (5) whether the officer identified himself as a police officer or claimed to act in a police capacity. *See Ramirez-Peyro*, 574 F.3d at 901; *United States v. Colbert*, 172 F.3d 594, 596 (8th Cir. 1999); *Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980).

Every one of these factors supports the conclusion that Willner was acting as a private individual, and not as a public official, when he allegedly assaulted Lawrence. Lawrence admits that Willner was off duty when she came to his house. Willner was not in Minneapolis, where he works, but relaxing at home in St. Paul. Lawrence has not alleged that Willner was wearing his uniform, badge, gun, or any other indicia of state authority. Willner did not have access to Lawrence because of his status as a police officer. Willner knew Lawrence because they had

been dating, and Willner had access to Lawrence on August 24 because she came to his house uninvited on a personal matter. Lawrence's complaint does not allege that Willner's motivation for acting was in any way related to his position as a police officer; to the contrary, she suggests that Willner reacted as he did "because he didn't want his new girlfriend to find out he was still involved with someone else." Compl. ¶ 62. And finally, Lawrence does not allege that Willner identified himself as a police officer or claimed to act in a police capacity. Lawrence knew that Willner was a police officer, of course, but that was because she had been dating him.

In her brief, Lawrence argues that when Willner detained her, he was acting under color of state law because he "was authorized to act as a police officer under relevant statutes." Lawrence Br. Opp. Willner Mot. Dismiss 16. Before addressing Lawrence's argument on the merits, the Court notes two things: First, Lawrence's argument directly contradicts the assertion in her complaint that Willner "had no authority as a police officer to arrest Lawrence without a warrant." Compl. ¶ 68. Second, even if Lawrence is correct that Willner *could* have acted as a police officer under the relevant statutes — and she is not — that does not mean that Willner *did* act as a police officer when he assaulted Lawrence. To the contrary, as discussed above, every indication is that Willner's altercation with Lawrence had absolutely nothing to do with the fact that he was a police officer.

Lawrence cites two state statutes that she says transformed Willner's actions from those of a private citizen into those of a state actor. Minnesota Statute § 629.40 authorizes an off-duty arrest by a police officer outside of his jurisdiction "*when and only when* confronted with circumstances that would permit the use of deadly force under section 609.066." Minn. Stat. § 629.40, subd. 4 (emphasis added). Minnesota Statute § 609.066, in turn, permits a police

officer to use deadly force "to effect the arrest or capture, or prevent the escape, of a person whom the officer knows or has reasonable grounds to believe has committed or attempted to commit a felony if the officer reasonably believes that the person will cause death or great bodily harm if the person's apprehension is delayed." Minn. Stat. § 609.066, subd. 2(3).

Lawrence argues that Willner must have "know[n] or ha[d] reasonable grounds to believe" that Lawrence had committed a felony burglary by forcing her way into the house when Willner answered the door. And Lawrence further argues that Willner reasonably believed that Lawrence would have killed him or caused him great bodily harm because of the abusive voicemail messages that she had left for him, including a message in which she told Willner that she hoped that he would die. Thus, Lawrence argues, Willner was authorized to use deadly force, and Willner, despite being an off-duty police officer outside of his jurisdiction, was acting pursuant to § 629.40 in forcefully detaining her.

There are at least two problems with Lawrence's argument. First, whether an individual acts under color of state law for purposes of § 1983 is a question of federal, not state, law. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961) (reversing, on federal-law grounds, Delaware Supreme Court decision that restaurant located in city-owned, publicly-financed parking facility was acting in a private capacity under its commercial lease, and thus was not a state actor subject to equal-protection lawsuit when it refused to serve a man based on his race); *see also Midfelt v. Circuit Court of Jackson Cnty.*, 827 F.2d 343, 345 (8th Cir. 1987). Lawrence makes no argument that Willner is a state actor under the "sufficient nexus" standard articulated by the Eighth Circuit in *Ramirez-Peyro*, 574 F.3d at 900. As the Court has already demonstrated, it is clear that, under the sufficient-nexus test, Willner was not acting under color of law.

Second, even if the Court were to read *Burton* and *Midfeldt* to mean merely that state law cannot *shrink* the pool of individuals whom federal law would deem to be state actors — but to leave open the possibility that state law can *expand* the state-actor pool — the Court still could not conclude that Willner was acting under color of state law.  Again, the Court must accept as true the facts alleged by Lawrence in her complaint.  And under those facts, as the Court has already remarked, there was no reason for Willner or anyone else to conclude that Lawrence was trying to burglarize Willner's home.  According to the complaint, Lawrence *rang Willner's doorbell* and asked him to step outside to talk.  Moreover, according to the complaint, Lawrence never set foot inside of Willner's house.  Unless Lawrence has psychokinetic powers, it is hard to know how she could burglarize a home that she did not even try to enter.  Accepting these facts as true — facts that are at the core of all of Lawrence's claims — Willner could not have reasonably believed that Lawrence showed up at his door to commit a felony burglary.  Without such a belief, Willner was not authorized under § 609.066 to use deadly force, and he therefore was not authorized under § 629.40 to arrest Lawrence while he was off-duty and outside of his jurisdiction.

Because § 629.40 did not authorize Willner to arrest Lawrence, Willner had only the arrest power of a private citizen.  *State v. Filipi*, 297 N.W.2d 275, 278 (Minn. 1980).  To maintain a § 1983 claim against a private citizen who made a citizen's arrest, a plaintiff must come forward with specific facts demonstrating that the private citizen "can fairly be said to be a state actor."  *Spencer v. Landrith*, 315 Fed. Appx. 62, 66 (10th Cir. 2009) (internal quotations and citations omitted) (upholding dismissal of § 1983 claim against private citizen who participated in arrest where no such facts were alleged).  Lawrence has alleged no such facts.

From the time that Willner answered his door until the time that Lawrence left the scene in an ambulance, Willner was "neither actually acting in his official capacity or exercising his responsibilities pursuant to state law, nor purporting to so act." *Roe v. Humke*, 128 F.3d at 1216. Lawrence's excessive-force claim against Willner must therefore be dismissed.

### b. Conspiracy Claims

With respect to her other constitutional claims against Willner, Lawrence contends that it is irrelevant whether Willner was acting under color of state law because he acted "in concert with" — that is, in furtherance of a conspiracy with — the St. Paul defendants to violate Lawrence's constitutional rights.[10]   Compl. ¶ 68; Lawrence Br. Opp. Willner Mot. Dismiss 13. Of course, when no constitutional right has been violated, no § 1983 conspiracy liability attaches. *Parks v. City of Horseshoe Bend*, 480 F.3d 837, 840 (8th Cir. 2007).   Therefore, Willner cannot be liable under § 1983 except for conspiring with Officers Bolduan and Jerue to retaliate against Lawrence in violation of the First Amendment.   All other claims against the St. Paul defendants have been dismissed.

Willner initially argues that a civil-rights conspiracy claim may be brought under only 42 U.S.C. § 1985, not § 1983, and that because Lawrence pleaded no § 1985 violation, she may not now argue that Willner was part of a conspiracy to deprive Lawrence of her civil rights. Willner's view of the law is incorrect.   The Supreme Court has recognized that a civil-rights

---

[10]The conspiracy claim that is allegedly made in Lawrence's complaint is arguably not "plain," *see* Fed. R. Civ. P. 8(a), given that neither the Court nor any defense lawyer was aware that such a claim existed until Lawrence submitted her response briefs.  But defendants do not argue for dismissal on this basis.

conspiracy between one or more public officials and one or more private citizens may be actionable under § 1983. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970).

To prove a § 1983 conspiracy claim, Lawrence must show "that the defendant conspired with others to deprive . . . her of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured the plaintiff." *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999). A private actor may be liable as a § 1983 conspirator when the private actor reached an agreement with a person acting under color of state law to retaliate against the § 1983 plaintiff for her protected First Amendment activity. *Dossett v. First State Bank*, 399 F.3d 940, 947 (2005). To maintain a § 1983 conspiracy action against Willner as a private individual, Lawrence must prove that Willner willfully participated with and reached a mutual understanding with state officials concerning the unlawful objective of the conspiracy. *See White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (citing *DuBose v. Kelly*, 187 F.3d 999, 1003 (8th Cir. 1999)).

A conspiracy claim under § 1983 "requires allegations of specific facts tending to show a 'meeting of the minds' among the alleged conspirators." *Murray v. Lene*, 595 F.3d 868, 870 (8th Cir. 2009) (quoting *Kearse v. Moffett*, 311 F.3d 891, 892 (8th Cir. 2002)). A private party does not conspire with government actors for purposes of § 1983 merely by "invoking an exercise of the state official's authority" — for example, by calling the police. *Young v. Harrison*, 284 F.3d 863, 870 (8th Cir. 2002). Rather, a plaintiff alleging a conspiracy between a private party and a government actor must allege facts that would permit a reasonable jury to find that the two reached an agreement to violate the plaintiff's constitutional rights.

This Lawrence has failed to do.  Lawrence's complaint provides only one reason to believe that Willner conspired with Officers Bolduan and Jerue:  Officer Jerue talked to Willner in his home.  Compl. ¶¶ 39, 43.[11]  Lawrence freely admits that she did not hear their conversation.  As Lawrence writes, Officer Jerue's conversation with Willner "occurred outside [her] sight and hearing, [but] afforded the opportunity for the type of planning session that is contemplated when analyzing a civil conspiracy."  Lawrence Br. Opp. Willner Mot. Dismiss 14.  But alleging that two people had the *opportunity* to conspire — i.e., that they could have met with each other, or called each other, or e-mailed each other — is obviously not sufficient to "nudge[]" a conspiracy claim "across the line from conceivable to plausible."  *Twombly,* 550 U.S. at 570.  If it were, then no conspiracy claim — including the conspiracy claim in *Bell Atlantic Corp. v. Twombly* — could be dismissed for failure to plead "enough facts to state a claim to relief that is plausible on its face," because defendants almost always have the opportunity to communicate.  *Id.*

To be generous to Lawrence, though, one could argue that not only does her complaint allege that Willner had the opportunity to conspire with Officers Bolduan and Jerue, but her complaint also alleges that Officers Bolduan and Jerue acted in a manner that was consistent with the existence of a conspiracy when they had Lawrence's car towed and blood tested.  The problem for Lawrence is that a very similar argument was rejected in *Twombly*.  In *Twombly*, the

---

[11]The complaint also alleges that, in the photograph that appears on his driver's license, Willner is wearing his police uniform.  But the complaint does not allege that either Officer Bolduan or Officer Jerue *saw* Willner's driver's license.  And, of course, even if the two officers saw Willner's driver's license, and noticed that he was wearing a police uniform, that would give them reason to believe that he was a police officer.  That would not give a jury reason to believe that they entered into a conspiracy with Willner to retaliate against Lawrence.

plaintiffs accused the defendants of conspiring to restrain trade in violation of § 1 of the Sherman Act.  5 U.S.C. § 1.  In support of their accusation, the plaintiffs alleged that the defendants had taken various anti-competitive actions that were consistent with the existence of such a conspiracy.  The Supreme Court held that, while it was indeed possible that the defendants had acted pursuant to a conspiracy, it was also possible that the defendants had acted independently, given that "resisting competition is routine market conduct."  550 U.S. at 566.  "[I]f alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy," the Supreme Court said, "pleading a § 1 violation against almost any group of competing businesses would be a sure thing."  *Id.*  The Supreme Court dismissed the complaint:

> [W]e hold that stating such a [§ 1 conspiracy] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. . . . [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. . . .

*Id.* at 556-57.

Much the same could be said about Lawrence's complaint.  It is certainly possible that Officers Bolduan and Jerue had Lawrence's car towed and blood tested because they had entered into a conspiracy with Willner.  But it is also possible that they acted on their own to protect a fellow police officer — or that they had entirely legitimate reasons for their actions.  If it were enough merely to allege that a police officer investigating a complaint against another police officer did something that adversely affected the complainant, then pleading a conspiracy "would be a sure thing."

The bottom line is that Lawrence's complaint does not contain "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. The factual allegations underlying Lawrence's conspiracy claim are not enough to push that claim "across the line from conceivable to plausible." *Id.* at 570. For that reason, the conspiracy claim against Willner must be dismissed.

## C.  Malicious Prosecution

Lawrence alleges a state-law malicious-prosecution claim against all defendants.[12] Compl. Count II. To prevail on this claim, Lawrence must show: (1) that defendants initiated criminal proceedings against her (a) without probable cause and (b) with malice, and (2) that the proceedings terminated in Lawrence's favor. *Henry v. City of Minneapolis*, 512 F. Supp. 293, 295 (D. Minn. 1981); *Stead-Bowers v. Langley*, 636 N.W2d 334, 338 (Minn. Ct. App. 2001). Lawrence cannot make out a malicious-prosecution claim.

First, for reasons already described, Lawrence's prosecution was supported by probable cause.

Second, the criminal proceedings obviously did not terminate in Lawrence's favor. Lawrence pleaded guilty to one count of harassment in exchange for the dismissal of three other charges, a decidedly unfavorable result. *See Bontkowski*, 28 F.3d at 37.

---

[12]The Court notes that Minnesota's statute of limitations for malicious-prosecution claims is two years, and thus Lawrence's claim appears to have been brought four years too late. *See* Minn. Stat. § 541.07(1). But no defendant raised a statute-of-limitations defense, so the Court will address the claim on the merits.

Finally, there is no hint in Lawrence's complaint that any of the defendants — save the St. Paul City Attorney's Office — initiated the prosecution against her. In Minnesota, prosecutors are absolutely immune from civil liability arising out of the filing of criminal charges, and thus Lawrence's claim against the St. Paul City Attorney's Office must be dismissed. *Erickson v. Cnty. of Clay*, 451 N.W.2d 666, 670 (Minn. Ct. App. 1990). Although the other defendants do not enjoy absolute immunity, there is no allegation that any of those defendants controlled the decision of the St. Paul City Attorney to file charges, and thus they cannot be held liable for malicious prosecution. *See Dunham v. Roer*, 708 N.W.2d 552, 570 (Minn. Ct. App. 2006). The mere fact that Willner requested a criminal investigation and that St. Paul officers conducted one is not sufficient to support a malicious-prosecution action. *See Stead-Bowers*, 636 N.W.2d at 341.

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.    The motion of defendants City of St. Paul, Officer Laura Bolduan, Sergeant Sheila Hoff, Officer Robert Jerue, Sergeant Matthew Toupal, and the St. Paul City Attorney's Office to dismiss or, in the alternative, for summary judgment [Docket No. 4] is GRANTED IN PART and DENIED IN PART as follows:

    a.    With respect to plaintiff's claims against defendants Officer Laura Bolduan and Officer Robert Jerue under 42 U.S.C. § 1983 for retaliation against plaintiff Kimberly Lawrence for her protected First Amendment activity, the motion is DENIED.

       b.       The motion is GRANTED in all other respects.

2.      The motion of defendant Officer William Willner to dismiss or, in the alternative, for summary judgment [Docket No. 8] is GRANTED.

3.      Accordingly:

       a.       All of plaintiff's claims against defendants City of St. Paul, Sergeant Sheila Hoff, Sergeant Matthew Toupal, and the St. Paul City Attorney's Office are DISMISSED WITH PREJUDICE AND ON THE MERITS.

       b.       With respect to defendants Officer Laura Bolduan and Officer Robert Jerue, all of plaintiff's claims except her First Amendment retaliation claim are DISMISSED WITH PREJUDICE AND ON THE MERITS.

       c.       All of plaintiff's claims against defendant William Willner are DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated:  September 15, 2010           s/Patrick J. Schiltz         
                                      Patrick J. Schiltz
                                      United States District Judge